Mr. Justice Scott delivered the opinion of the Court. This case was argued at the January term, A.D. 1S49, by Mr. Attorney General Watkins, who in behalf of the State insisted that the actof the legislature, approved the 16th December, 1846, (Dig. p. 673 to 677, sec. 3 to 28 inclusive), conferring jurisdiction of assaults, affrays and assaults and batteries, upon justices of the peace, was unconstitutional and void, and urged a review of the opinion of this court as to that question in the case of The State vs. Cox, 3 Eng. 436. No task can be imposed upon us at any time of more delicacy and pain than that of investigating the constitutionality of a solemn act of a co-ordinate department of the government; and this before us is rendered even more than ordinarily so by the circumstance that the question that we have now to pass upon has already been adjudicated by this court. But it is again distinctly presented to us and urged with great earnestness and there is no alternative, at least for a majority of us, who have been sent to preside since that decision was made, and have never found reasons to be satisfied with the decision. But however unpleasant may be this public duty in general, there can be no doubt but that upon its faithful discharge on all proper occasions, depend, to a great extent, the integrity and duration of the government in its purity under our American system of checks and balances. We cannot then shrink from the duty, when a legal doctrine must be sanctioned or repudiated, the direct tendency of which is to destroy one of “ the great landmarks of the constitution” which the people in convention have declared “ shall remain forever inviolate,” although in its present application it may not be likely to be either “ revolutionary in its tendency or to inflict a serious wound upon the liberty or safety of the citizen.” Because whether the consequences be greater or less, when one of these great principles is assailed our duty is the same. And this must needs be so to achieve the great purposes in this connection designed to be accomplished by the framers of our government through the instrumentality of the judicial department. Because in the history of governments usurpation has been almost uniformly mincing at first only to grow bolder and bolder as it has step by step made advancement to matters of greater magnitude; and when unopposed in its incipient progress has with a like uniformity paralyzed counteracting forces in an inverse ratio. But although this is our stern duty we are not upon slight implication or vague conjecture that the legislature has transcended its power, even as to one of these great land marks of the constitution, to pronounce its acts void. On the contrary, every rational doubt must be solved in favor of that co-ordinate branch of the government whose act has been done under the like solemn sanction that our duty is to be performed; and therefore the opposition between the constitution and such act must be such that the court feels a clear and strong conviction of their incompatibility with each other. (Fletcher vs. Peck, 6 Cranch 87. Ex parte Colburn, 1 Cowen 564.) By this rule we must test the act in question; and its fate, although it is sustained by the previous opinion of this court, must depend upon its conformity or non-conformity to the paramount provisions of the constitution. It is urged upon the part of the State, and we think with great show of reason, that the act in question is in direct and irreconcilable conflict with the 14th section of the Bill of Rights, which declares, “ That no man shall be put to answer any criminal charge but by presentment, indictment or impeachment.” And to obviate this objection it has been attempted to be shown, in the opinion of this court in the case of The State vs. Cox, that this provision of the Bill of Rights has been yiro tanto repealed by the amendment to the constitution ratified by the legislature in November, 1846, which provides, “ That the General Assembly shall have power to confer such jurisdiction as it may from time to time deem proper on justices of the peace in all matters of contract, covenant, and in actions for the recovery of fines and forfeitures when the amount claimed does not exceed one hundred dollars and in actions and prosecutions for assaults and batteries and other penal offences less than felony, which may be punishable by fine only.” It is in effect conceded in that opinion that, if this section of the Bill of Rights be not thus partially repealed, the act in question is clearly unconstitutional and void. Then this question of repeal was and is the great point of inquiry and all other points are but in elucidation of this question of repeal. And in the examination of this controling question the State submitted that a repeal, either partial or entire of any of the provisions of the Bill of Rights, was beyond the powers of the General Assembly, even when in the exercise of their delegated authority to amend the constitution. "This objection the court attempted to meet by the position that, when the General Assembly proceeds to amend the constitution in the mode provided in that instrument, that body acts in the capacity of a convention as contra-distinguished from ordinary legislative action, and as such possesses all the soverign powers of the people, except such of these as have been delegated to the Federal Government; and being thus clothed with all the sovereign powers of the people not delegated to the Federal Government they have necessarily the power to repeal the whole or any part of the Bill of Rights. And this they endeavor to maintain by assuming that the declaration of the Bill of Rights, that every thing contained therein “is excepted out of the general powers of the government and shall forever remain inviolate” extends as a prohibition upon the legislature no further than while in the exercise of their ordinary functions; and that therefore when in the exercise of their extraordinary powers no prohibition upon or qualification of these powers, springing out of the Bill of Rights, rests upon the legislature ; and consequently, when acting in the latter capacity, they are clothed with all the sovereign powers of the people not delegated to-the Federal Government. The court seems to base this assumption upon a construction of the expression “ general powers,” that limits it to the ordinary legislative functions of the government founding this úpon a distinction between general and specific powers vested in the the General Assembly ; and then to attempt to fortify it by the circumstance that among other things the Bill of Rights declares that “ all laws contrary thereto” shall be void. This will seem to be a very unsatisfactory manner of sustaining such an assumption, when it is considered that the expressly declared object of the Bill of Rights (sec. 24) is not only “ to guard against any encroachment on the rights therein retained,” but also and equally to guard against “ any transgression of any of the higher powers delegated,” and that with an evident view only to accomplish effectually both of these objects, it is also expressly declared not only that every thing in the Bill of Rights contained shall be “ excepted out of the general powers of government” but also that they “ shall forever remain inviolate.” And then, that these two objects may be still further and more completely effectuated, it is also expressly declared not only that all laws contrary to the Bill of Rights shall be void, but also that all laws contrary to the other provisions of the constitution shall be likewise void. And that this is a correct exposition of the 24th section of the Bill of Rights cannot be doubted, when that section is analysed in connection with the whole bill and especially with the opening provision, whereby it emphatically appears that the great object in view was that “ the great and essential principles of liberty and free government may be recognized and unalterably established.” Consequently in this view of the subject this want of satisfactory reasoning upon the part of the court arises from the fact that the base upon which they rest the assumption that the Bill of Rights operates as a limitation upon the power of the General Assembly only while in the exercise of their ordinary legislative functions is greatly too narrow to authorize their conclusion. Because any legitimate conclusions that can be drawn either from the premises that they assume' as to the “ general powers of government” or from those that “ all laws contrary to the Bill of rights shall be void” fall very far short of excluding the idea that the Bill of Rights operates as a limitation upon the powers of the General Assembly, when in the exercise of the extraordinary powers. It being obvious, as we have already shown, that the declaration that the matters contained in the Bill of Rights shall be “ excepted out of the general powers of government,” and the declaration that “ they shall forever remain inviolate,” and that all laws passed which may be “ contrary” to the Bill of Rights or “ contrary to the other provisions” of the constitution shall be equally “ void,” are but successive and cumulative guarantees or “ guards against encroachments on the rights (therein) retained” as well as like cumulative guarantees or “ guards against any transgression of any of the higher powers (therein) delegated.” The great object designed to be accomplished having been as well guards against encroachments upon rights retained as against the transgression of the higher powers delegated, and these other pro visions were but the means provided for their accomplishment. Hence the correct definition of a Bill of Rights would seem to be an instrument which' fixes limitations as well upon the powers of the civil magistrate as upon the legislative department of the government, while at the same time it secures the civil and political rights and liberty of the citizen. And this is in accordance with the view oí such instruments taken by Mr. Smith in his recent publication upon Statutory and Constitutional construction,page 107, sec. 78. Although then it may be admitted, as is beyond all doubt, that the Bill of Rights operates with a contrary influence upon, ordinary legislative functions, and also operates to make void an act of the legislature in opposition to any of its provisions or declarations, this cannot possibly prove that it does not also ■operate with a like controling influence upon the acts of the General Assembly when in the exercise of the powers delegated to them to amend the constitution although these may be denominated “ specific” powers. Because for this to be proven it is not sufficient for these powers simply to be denominated “ specific ;” but it will become indispensible to show that they, whether denominated specifiic or otherwise, are in fact not among the “ higher powers delegated,” to guard against the transgression of which the successive and cumulative provisions already mentioned were adopted. And no one will pretend that these powers of amendment are not some of the “ higher powers delegated;” nor will any one contend that they are not legislative powers, unless they could suppose that constitutional law was no law at all, or else because it required about two years to enact constitutional law while any ordinary statute may be enacted within a few days. The result then is that the court, in their opinion, totally failed in exhibiting any reason at all, that even tended to show that the Bill of Rights did not operate with a like controling influence upon the ordinary functions of the legislature; and consequently their position as to this point is a clear baseless assertion. Now we assert the contrary and for the proof of the correctness of our position cite the exposition of the 24th section of the Bill of Rights, which we have already given, whereby it appears expressly that one of the two great ends designed to be achieved by this entire instrument was not to guard against the transgression of some only of the higher powers delegated (as the “ general powers of government” as defined in the opinion of the court that we have been examining) but emphatically to guard against “ any transgression of any of the higher powers delegated,” which necessarily includes all the powers delegated, whether they be denominated “general powers” or “specific powers,” and inevitably therefore if these powers of amendment be a portion of the “higher powers delegated,” which no one will attempt to gainsay, they must necessarily be as much within the controling influence of the provisions of the Bill of Rights as any others of these delegated powers. And this is our deliberate opinion, and consequently the position submitted as a correct one by Mr. Attorney General Watkins, that a repeal either partial or entire of any of the provisions of the Bill of Rights is beyond the powers of the General Assembly, even when in the exercise of their delegated authority to amend the constitution, is a correct position and clearly maintainable as such both by the letter and the spirit of the Bill of Rights., And we think this position is fortified very strongly by some general considerations touching our constitution and form of government at which we will proceed very briefly to glance. The term “ Bill of Rights” is derived primarily from the 2 St. W. & Mary, ch. 2, and it was so called because that statute declared the true rights of the British subject. (Bou. Laio Die. p. 211.) The object of that statute as well as of other British statutes of a like kind subsequently passed from time to time, and also of the charters of the same caste obtained from the king was avowedly that, at the same time that they should operate as a limitation upon the powers of the crown, they should effectually secure from encroachment from any quarter the ascertained and declared rights of the subject. Thus these give the original of the true idea of the legitimate office of a Bill of Rights. And when it may be remembered that the political aphorisms, general principles and fundamental ideas of free governments, which enter into and form the subject'matter of a Bill of Rights such as ours, are all of a character to be appropriately held sacred by the people, both from their venerable antiquity and from their having been obtained by our British ancestors as the fruits of perpetual struggle for freedom between the people and the crown: and that when thus obtained they have been preserved in the manner indicated to effect the two great objects specified, it would not seem at all remarkable that the people in our day should place all these great essential elements of free government beyond the possibility of invasion by any earthly power and retain themselves the exclusive right either to modify or to disregard them entirely as no longer of inestimable value. And indeed it would seem somewhat remarkable that after the people in convention should have gravely and deliberately made a solemn declaration of these great and essential principles of liberty and free government, whose aggregation had been the slow work of centuries, and had made this declaration in order, as it is said in the opening sentence of the instrument, that they “ may be recognized and unalterably established and in accordance with this design had in the conclusion of the declaration made effective provision both against any encroachment upon the rights of the citizen therein defined and also against any transgression of any of the higher powers delegated for the purpose of setting on foot, carrying on and perfecting a government; that they should have afterwards, by other provisions in the same constitution, clothed a perpetual body of representatives with the- unqualified power to overturn at will every vestige of all those sacred and inestimable rights and safeguards of liberty. Because to do this would be to give a clear authority, by the written constitution of a government essentially free, to their representatives to erect upon the ruin of these rights and safeguards an absolute and despotic government, if their will to do so were sufficiently depraved. And this is the inevitable practicable result when the principle . is carried out its full extent, that the Bill of Rights exerts no qualifying or controiing influence upon the General Assembly when in the exercise of their delegated powers to amend the constitution. And direct facilities are afforded for such ultra exercise of these high powers, if they are thus unqualified, by the express provision in the constitution, that although in gen■eral the two houses shall publish a journal of their proceedings, nevertheless that such parts of these journals as “may in their opinion require secrecy” may be 'kept secret from the people. No such result, however, can possibly transpire in the opposite view of this question, because when in the exercise of these high powers the General Assembly are perpetually limited to such provisions as may be in consonance with the declared essential principles of free government. And when a government is to be constructed upon any other principle, or when any of these principles are to be repudiated or modified, the people alone have the “ unqualified right” to act in the premises. (Sec. 2 of Bill of Rights.) And this unqualified right they can constitutionally exercise by means of the legislative action of the General Assembly in providing by law for the call of a convention of the whole people to re-construct or reform the government either partially or entirely. And such convention, when assembled and invested with the entire sovereign power of the “whole people (with the exception of such of these powers as have been delegated to the Federal Government) may rightfully strike out or modify any principle declared in the Bill of Rights if not forbidden to do so by the Federal constitution. And even if such a convention were assembled for a partial reform only of the government, as for a reform of the judicial department for instance, and it should transcend its authority as by adopting reforms in the executive department also, such excessive amendment would be valid when subsequently ratified by a direct vote of the people themselves, upon the principle that the subsequent ratification of a previously unauthorized act is fully equivalent to a previous delegation of authority to do that particular act. But this principle can have no legitimate place when the ratification of an amendment is not by the people but by the General Assembly; because in such case the ratification would be by the agents who had no greater authority to ratify an unauthorized act than was possessed by the first body of agents to propose the particular unauthorized act. Having then expressed our opinion that any repeal, either partial or entire of any of the provisions of the Bill of Rights, is beyond any of the powers of the General Assembly, and alluded to the general consideration by which this opinion is fortified, we might at once hasten to a conclusion upon the main question before us ; but as we differ radically with the court in its opinion as expressed in The State vs. Cox, on the question of the constructive repeal as there held, we will briefly allude to that question before concluding this opinion. It is distinctly there admitted that there are no expressed indications of any intention to repeal the 14th section of the Bill of Rights, and that, if there has been in fact any repeal of it, such is purely and entirely the result of implication. The court remarking on this point that, “ It does not do-so by express words and if at all, it is by implication, resulting from incompatibility between that section and the amendment. To determine this question the usual and ordinary rules of construction are applicable.” The court then go into a very graphic description of what they suppose was the mischief that moved the legislature to propose and adopt the amendment to the constitution, delineate strikingly the outreness of gravely empanneling a grand jury with the incidents of bills of indictment and prosecuting attorneys before a simple justice’s court, and conclude by showing how convenient and appropriate it would be if the Bill of Rights could be so modified as to allow justices, to take cognizance of the cases authorized to be transferred from the circuit court to their jurisdiction without all the cumbersome machinery connected with the functions of a grand jury. And then from this foundation they draw the implication that the amendment is incompatible, pro tanto at least, with the 14th section of the Bill of Rights, and upon this implied incompatibility they imply a pro tanto repeal of that section. Thus resting a presumptive repeal upon a presumptive incompatibility without even attempting to show any semblance of the invincibility of the presumptive incompatibility. The only effort made to sustain this supposed repeal pro tanto thus arrived at by the mounting of one implication upon another, is by the invocation of a rule that the court presents in these words, “ Such construction should be put upon the amendment as will give it effect and not defeat the obvious intention of the framers of that provision.” Now, in the first place, before this or any other rule of construction could have anyplace for operation it was indispensable to have shown that there was a necessity for construction, because of that other rule “ That in the absence of ambiguity no exposition shall be made which is opposed to the express words of the instrument, or in other words, it is not allowable to interpret what has no need of interpretation. (Smith on St. & Const. Con. p. 651, sec. 505.) No such necessity was shown otherwise than by the presentation of considerations to prove that it might be more inconvenient for the justice to take cognizance of the cases authorized to be transferred .to his jurisdiction coupled with the action of a grand jury than without the intervention of the action of such a body. No ambiguity whatever in any of the terms used in the amendment of the constitution is pretended. No complaint is made against its perspicuity of expression, but the complaint is that it did not go farther and express in like perspicuous language that which in the opinion of the court would have made more convenient regulations for the trial and determination of the causes provided to be transferred from the jurisdiction of one tribunal to another. And thus being so mere cumbersomeness and inconvenience lay no vestige of foundation for the legitimate application of the rule invoked, unless that rule were broad enough to authorize the court to make a new law to cover the case; because in cases of mere inconvenience, “ if the intention of the legislature is expressed in terms which are sufficiently intelligible to leave no doubt on the mind, where the words are taken in their ordinary sense, it has been held that it would be going too far to hold that a constrained or enlarged interpretation should be put upon the statute to avoid any inconvenience. The reason for this is that it is but reasonable to presume that the legislature contemplated such inconvenience as being probably overbalanced by the particular advantage the act was 'calculated to produce.” Smith on St. Co. Cons. 693, sec. 548. And the supreme court of the United States have held that where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature must be intended to mean what it has plainly expressed and consequently no room is left for construction. (7 Cranch R. 52.) And Mr. Dwarris lays down the rule that, “ Where the object of the legislature is plain and unequivocal courts ought to adopt such a construction as will best effectuate the intention of the lawgiver. But they must not, in order to give effect to what they suppose to be the intention of the legislature put upon the provisions of the statute a construction not supported by the words, though the consequence should be to defeat the object of the act. The fittest course, in all cases where the intention of the legislature is brought in question, is to adhere to the words of the statute, construing them according to their nature and import in the order in which they stand in the act of parliament. They (the judges) are not to presume the intentions of the legislature, but to collect them from the words oí the act of parliament and they have nothing to do with the policy of the law. This is the true sense in which it is so often impressively repeated that judges are hot to be encouraged to direct their conduct by the crooked cord of discretion but by the golden metwand of the law.” lb. p. 590 sec. 545. Having then examined the ground upon which the “repeal by implication” seems to have been rested by the court, we will proceed to cite one or two rules of construction which we think applicable to the point and by which we propose to test this question; fully concurring, as we do, that this question is to be determined by “ the usual and ordinary rules of construction.” The first rule we shall cite is the general one, “ That it is deemed against the policy of the law to favor repeals by implication.” (Smith Com. St. & Con. Const, p. 879, sec. 758); or as it is generally more briefly expressed, “Repeals by implication are not favored.” (1 Tuck. Lee. p. 17. 1 Wash. R. 299.) And this is in exact accordance with another rule, that, “ If two laws only so far disagree or differ as that they may by any other construction both stand, they will both be upheld, for whenever this can be done, the rule that subsequent laws abrogate prior ones does not apply, and the last law will not operate as a repeal of the former.” Smith Co. St. & Con. Const, p. 879, sec. 957. So, the spirit of the following rule of exception to a very general rule has direct application in forbidding a repeal by implication. That is to say, that, although it is a general rule that a remedial statute must be construed liberally so as most effectually to meet the general end in view and suppress the mischief, yet this rule in general is applicable to the remedy merely, and in some cases has no application at all to the proceedings in the attainment of the remedy; as in cases where such proceedings are summary and in derogation of the common law or of common right; and in all such cases, the rule of strict construction applies to all such proceedings, although instituted under a remedial statute which, as a remedy, is to be liberally construed, as that it shall be made to apply as a remedy to all cases within the mischief. Smith vs. Moffit, Barbour Su. Ct. Rep. 65, and the cases there cited. Now, in the first place, it clearly results from these rules that, to authorize the holding of a repeal by implication, the incompatibility between the two laws must not consist in mere inconvenience, but it must amount to a repugnance that is invincible; so that both cannot stand without glaring injustice or the grossest absurdity. And so far from these rules authorizing the courts to depart from the letter of the law in order to enable them to divine a repeal by implication from something de hors the law, which is merely inconvenieut, they authorize such departure for the very opposite purpose; that is to say, for the purpose of preventing a constructive repeal. And for this latter purpose they not only authorize but compel such departure, if by this means a construction can be attained which can reasonably uphold both laws: and all this for the reason that the law has no favor for constructive repeals. And this is in accordance with the every day practice of the courts; and this principle is illustrated by the case where a previous law had provided for the free passage of fish up and down a stream, and a subsequent statute had authorized the building of a mill dam across this stream: and it was held that the subsequent did not repeal the previous law, and consequently that the owner of the dam must keep a passage open in his dam during a portion of the year, so that fish might go through during their running season. Vinton vs. Welch, 9 Pick. R. 87. Now it cannot be successfully maintained that to require the action of a grand jury upon that class of cases construed tobe transferred to the justices’ jurisdiction, can amount to any thing more than inconvenience. And that, on the contrary, that such action would actually in such cases amount to an invincible obstacle to the exercise of jurisdiction. Because every one must admit that it is practicable to provide by law for the legitimate action of a grand jury on all these oases although transferred to the jurisdiction of a justice of the peace. And this being so it follows that there is no vestige of ground for the legal position that the adoption of the amendment to the constitution in question repealed the 14th section of the Bill oí Rights by implication. But even if inconvenience and cumbersomeness were sufficient grounds to base a constructive repeal upon in a case like this where the subsequent law was a purely remedial one and should therefore be so construed as to advance the remedy and suppress the mischief, it is by no means clear that it could work a repeal by implication in such a case as this. Because the spirit of the exception to the rule, as we have shown that exception to exist, would seem absolutely to forbid it; inasmuch as the effect of holding a constructive repeal would be to develope a mode of proceeding that would be contrary to common right and would be summary in its nature. For surely the same reason that would dictate a strict construction of summary proceedings although instituted under'a remedial statute, would forbid their development by mere construction and implication. And because the same rule that refuses to presume in favor of the existence of summary proceeding derogating from common right and from the common law, beyond the express letter of the law, although these be connected with a remedial statute, would seem equally to presume against their existence at all unless such existence was based upon express law. And thus a presumptive repeal would be repelled by a presumption in favor of common right. So that, in whatever light we view this question of repeal it seems perfectly clear, not only that the legislature had no power to repeal the section of the Bill of Rights in question, but also that, even if that power was conceded to them that they did not do so by the adoption of the amendment in question, either in express terms or by legal implication. None of the legal rules \^.sustaining such rules by implication under the circumstances of this case, and all of them, that have any application, being emphatically and strongly against such a result. What then is the effect of the adoption of the amendment in question ? This question is of easy solution. The amendment having been adopted in the mode provided by the constitution has become incorporated in that instrument as one of its provisions. And having no necessary or even apparent conflict with a single provision of the entire instrument it is to be construed precisely as if it had been inserted in the constitution by the convention. The whole must be regarded, including the Bill of Rights, in order to fix its meaning, and when this is done, it is perfectly clear that it is but a provision of constitutional law -authorizing the legislature to confer jurisdiction upon justices of the peace in certain cases. The jurisdiction of which cases had been by the constitution, as originally adopted, invested in the circuit court until otherwise provided by law. The amendment does not of itself confer this jurisdiction upon justices of the peace or attempt to confer it. It but authorizes the legislature to do so. And consequently until this may be done by law the jurisdiction in these cases will remain in the circuit court. In principle this amendment is identical with that provision of the constitution which authorizes the General Assembly to “vest such jurisdiction as may be deemed necessary in corporation courts.” In both cases, when the jurisdiction conferred is criminal jurisdiction the 14th section of the Bill of Rights points out what provisions of lav/ shall be made by the legislature for the constitutional exercise of the jurisdiction conferred. In these and many other cases the Bill of Rights, as we have shown in a former part of this opinion, is a limitation upon the legislative powers delegated by the people to the General Assembly. So, other independent provisions of the constitution are limitations upon legislative authority, so long as they remain a part of the constitution : such as the provision in reference to the salary of a judge and those which provide for his removal from office. These are limitations upon the authority of the legislature to compel him to interchange circuits. This latter power is conferred upon the legislature by the second amendment to the constitution, yet this is not an unqualified power: and when provisions of law are made for its exercise, such must not be inconsistent with the provisions to which we have alluded, because these are also a part of the constitution and they must be all construed together. And this view as to limitation upon legislative power is expressly sustained by the opinion of the court in the case of Slattery, Ex parte (3 Ark. at p. 485.) And also by the case of Rector vs. The State, (1 Eng. 187) where the court say, “We have no doubt of the power of the legislature to confer jurisdiction upon corporation courts over criminal cases less than felony at the common law, yet in order to exercise that power it is necessary that it should be done by an act in strict conformity to the constitution. The act of 1840 conferring jurisdiction upon the city court of Little Rock in assaults and batteries, so far from conforming to that instrument is clearly repugnant to it. The one expressly requires either a presentment or indictment and the other as expressly dispenses with the necessity of both. It is therefore manifest that the act, so far as it attempts to confer jurisdistion upon the city court of Little Rock in cases of assault and battery, is a direct and palpable violation of the constitution and therefore absolutely void.” There are but two remaining points ; and one is that the terms, “presentment” and“ indictment” in the sense of the Bill of Rights, necessarily presuppose and include the action of a grand jury in the common law sense of these terms ; and the other is that assaults, affrays and assault and battery are “ criminal charges” in the same sense. As to these questions there is no contrariety of opinion or of authority, the same having been held in the affirmative in the cases cited and also in the case of The State vs. Cox, and these are sustained by all the authorities as to these two points. (Com. vs. Miller, 5 Dana 321. Ely vs. Thompson, 3 Marsh. Rep. at p. 74.) In general all cases are criminal, which are not civil cases. ■ There may be however more properly three classifications of cases, to-wit: criminal, penal and civil. Morton vs. Commonwealth, 3 J. J. Marsh, at p. 142. After then this full examination of all the points of the question' as to the conflict between the act of the legislature in question and the 14th article of the Bill of Rights, as submitted by Mr. Attorney General Watkins, we have but to announce our opinion that this conflict is direct and irreconcilable and that after a laborious and close investigation of every view of the main question that has been advanced in any quarter within our knowledge, we have not been able to find any ground of reason to base a doubt upon however slight of the correctness of this opinion. The remaining question is whether any part of the act of the legislature in question can stand or whether the entire act must fall. It is manifest from the whole act taken together that it was not the intention of the legislature either to strike out all the offences specified in the act from the calendar of crime or to abrogate all modes of punishing such offences. And that that intention was but to transfer the jurisdiction of such cases from the circuit court to the court of a justice of the peace, change the mode of proceding and to alter to some extent the character of the punishment. This intention we neither suppose or presume, but we collect it from the words of the act itself in its various provisions. But it may be urged that, although the entire act might be disregarded, except a portion of the first section which in effect is a repealing clause that ought to stand, because the legislature had the clear right to repeal all laws for the punishment of these offences, and "that the language employed in a part of that section is plain, perspicuous and unambiguous, and must therefore have effect although the mischief may result of all these offences going ‘unpunished. And this because of the rule that we have already cited, that there being no ambiguity of expression we cannot go beyond the letter into matter of inconvenience or of public policy and must therefore, so far as this clause is concerned, intend that the legislature meant what they have plainly expressed. Now the answer to all this is given in the reason of these rules that would be thus invoked; and that reason is, as we have already shown, “ That it is but reasonable to presume that the legislature contemplated all such inconvenience as being probably overbalanced by the particular advantage the new act was calculated to produce.” Because in the case presented by the objection we are examining as applicable to the case before us, all advanges that could have been possibly contemplated by the legislature to arise from the new act, as a counterpoise to the inconvenience to arise from the repeal of the old law, are effectually cut off by the inoperative character of the new act. And therefore there is no ground of reason upon which to base the rules invoked, and they can consequently have no application to a case where the new act can have no operation at all. If however the new act, with which this clause is interlocked, could have any operation, although such might be an inconvenient one, still the rules would apply, because such a state of things would afford ground upon which a presumption might rest that the legislature had contemplated all these inconveniences and had considered that the advantages of the new act would nevertheless counterbalance them. These rules then having no effective application in the state of the case before us, we are at liberty to search for the true intention of the legislature, and under this condition of things are to collect that intention not alone from the words of the act but also from the context, the subjéct matter, the effects and consequences arid the spirit and reason of the act, all considered together : these being all signs, natural and probable, from which the true intention is to be collected. And when so collected must have effect although against the letter of the law. Within this scope then we find the meaning of the legislature plainly expressed (when the whole act of which this repealing clause is a part is taken and considered together) to have been to repeal the old law only in case the new act could have been effective in all its essential provisions : and we find no reason at all to suppose that it was their intention to repeal any part of the old law otherwise than by the substitution of an effective new law in its place. We therefore hold that the entire act and every clause of it, entitled “ An act to define the jurisdiction and regulate the proceedings of justices’ courts in cases of breach of the peace,” approved the 16th December, 1846, is inoperative and void, the same being in our opinion in direct and irreconcilable conflict with the constitution; and that the entire law then in force applicable to assaults, assaults and batteries and to affrays, and to the mode of proceeding in the courts for such offences and those providing for their punishment are still in force as laws of the land, in so far as they may not have since been repealed or modified by any act of the legislature. And that the act of the legislature entitled “ An act to distribute the Digest of the State of Arkansas,” approved the 2d January, 1849, (although a legislative declaration that there were no other statutes of a general and permanent character in force at the end of the session of the General Assembly of 1846) did not repeal the laws we have alluded to touching the offences specified in the act we have just held void. And therefore that the courts of this State may look behind that Digest for any such laws as we did for the law applicable to the subject of Fees, in the case of Pulaski County vs. Downer, 5 Eng. 590. (a.) Note (a.) The only provisions of law applicable to these offences left out of the Digest, as having been repealed by the act of 16th December, 1846, are as follows: A simple assault, unattended with any apparent design to commit homicide or felony, shall, upon conviction of any person thereof, be punished by fine not exceeding one hundred dollars. Every person guilty of an assault and battery shall, on conviction thereof, be fined in any sum not less than ten dollars, nor more than two hundred dollars. Rev. Statute page 246, secs. 4 and 6. — Reporter. The result of the whole matter is that the opinion of this court in The State vs. Cox must be overruled and be no longer regarded as law; and the judgment of the circuit court in the case at bar affirmed, the proceedings and judgment having been according to law.